**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **WILLIAM JOHNSON, M01525,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **WEXFORD HEALTH SOURCES, INC.,** | ) | |
| **CENTURIAN, INC.,** | ) | |
| **LATOYA HUGHES,** | ) | |
| **ANTHONY WILLIS,** | ) | **Case No. 26-cv-1421-DWD** |
| **MATTHEW PLUMMER,** | ) | |
| **JOHN/JANE DOE 1 (assistant warden),** | ) | |
| **JOHN/JANE DOE 2 (assistant warden),** | ) | |
| **JOHN/JANE DOE 3 (medical director),** | ) | |
| **PHILLIPA DEVENNEY,** | ) | |
| **ANGELA CRAIN,** | ) | |
| **TARA CHADDERTON,** | ) | |
| **SANDRA GOVRO,** | ) | |
| **CONNIE DOLCE,** | ) | |
| **UNIDENTIFIED JOHN/JANE DOES,** | ) | |
| | ) | |
| **Defendants.** | ) | |

# MEMORANDUM AND ORDER

**DUGAN, District Judge:**

Plaintiff William Johnson, an inmate of the Illinois Department of Corrections (IDOC) currently detained at Menard Correctional Center (Menard), brings this civil rights action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights. (Doc. 1). Plaintiff alleges that the defendants have violated his rights by failing to treat his prostate pain, enlargement, and hydrocele for over 3 years. Plaintiff's Complaint (Doc. 1) is now before the Court for preliminary review pursuant to 28 U.S.C. § 1915A. Under Section 1915A, the Court is required to screen prisoner complaints to filter out

non-meritorious claims. *See* 28 U.S.C. § 1915A(a)-(b). Any portion of a complaint that is legally frivolous, malicious, fails to state a claim upon which relief may be granted, or asks for money damages from a defendant who by law is immune from such relief must be dismissed. 28 U.S.C. § 1915A(b). At this juncture, the factual allegations of the *pro se* complaint are to be liberally construed. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 821 (7th Cir. 2009).

**The Complaint**

Plaintiff first experienced pain in his groin, lower back, lower abdomen, and left testicle on September 10, 2021. (Doc. 1 at 12). The pain awoke him from sleep, and he also needed to urinate frequently, disrupting his rest. (*Id.*). Plaintiff also began to experience chronic pain while sitting, standing, walking, or carrying heavy items. (*Id.* at 13). He alleges he began to send sick call slips, but was not seen in September, October, November or December. (*Id.* at 13-14). He attempted to file several grievances in February of 2022 to no avail. On May 27, 2022, while at an outside hospital for an esophageal procedure, Plaintiff complained about his pain. He was informed that his urine samples were abnormal but received no treatment. (*Id.* at 15-16).

On June 27, 2022, Plaintiff alleges he filed a grievance about the denial of medical care faulting Defendants John Does 1-3, Dolce, Crain, and the miscellaneous John Does for denying care, and faulting Defendants Wexford, Hughes, and Willis for failing to correct known systemic deficiencies and/or for failing to train, supervise, and correct behaviors of the other defendants. Plaintiff makes a similar allegation repeatedly throughout the complaint, alleging he sent similar grievances on: October 4, 2022,

December 26, 2022, January 29, 2024, February 21, 2024, November 15, 2025, December 20, 2025, April of 2026, and June 10, 2026.

On August 30, 2022, Plaintiff had x-rays of his back in response to sick call slips, but there was no follow-up after the imaging. Plaintiff filed a grievance about the lack of follow-up on October 4, 2022. (*Id.* at 17). He was seen at sick call many times in response to request slips, but nurses indicated they could not help and merely placed him on the list to see a doctor or nurse practitioner. On January 20, 2023, Plaintiff saw nurse practitioner Dearmond, a non-party to this case. Dearmond performed a genital and prostate exam, ordered an abdominal x-ray, and ordered an ultrasound. (*Id.* at 19-20). Dearmond also advised Plaintiff that he needed to see a urologist to assess a left hydrocele. Dearmond suggested a biopsy, but prescribed nothing for the pain. (*Id.* at 20).

On February 25, 2023, Plaintiff wrote letters to Defendants Wexford and Hughes concerning his enlarged prostate, possible hydrocele, and persistent pain. He alleges he complained about Defendants Willis, John Does 1-2, Crain, Dolce, and the miscellaneous John Does. (*Id.* at 20-21). He alleges he never got a response. Plaintiff alleges he sent similar letters on October 18, 2024 and April 18, 2026.

On March 7, 2023, Plaintiff was prescribed six months of Flomax at nurse sick call. (*Id.* at 21). On June 27, 2023, Plaintiff saw a urologist for the first time who confirmed that he had a hydrocele and enlarged prostate. (*Id.*). The doctor doubled Plaintiff's Flomax prescription and promised to operate as soon as Defendant Wexford approved surgery. (*Id.* at 23). On October 31, 2023, Plaintiff had surgery. (*Id.* at 22-23). On November 20,

2023, Plaintiff attended a surgical follow-up visit where it was noted that he still had pain and swelling and that the surgery was unsuccessful. (*Id.* at 22). On November 22, 2023, Plaintiff was sent out for a second ultrasound on his hydrocele. (*Id.* at 24).

Plaintiff alleges he submitted numerous sick call and HCU slips in November and December of 2023, and January of 2024. Nurses acknowledged his issue but offered no treatment. Plaintiff alleges the ongoing pain significantly impacted his quality of life and caused stress and anxiety about the possibility of having untreated cancer. (*Id.* at 25-28). On April 25, 2024, Plaintiff again saw a urologist who promised another surgery and a biopsy as soon as Wexford approved. (*Id.* at 29). Plaintiff underwent an additional ultrasound on May 31, 2024. (*Id.*).

On July 23, 2024, Plaintiff saw Dr. Comparin, a non-party doctor, at the prison's healthcare unit. (*Id.* at 29-30). He explained his medical issues to Comparin and Comparin said the only option was to refer him to a urologist. (*Id.* at 30). On November 5, 2024, Plaintiff's Flomax prescription was cut in half without explanation. (*Id.* at 31). He alleges the sole reason was to save Wexford money, though he also says he wrote the healthcare unit about it and got no response.

On July 24, 2025, Plaintiff was sent to a urologist but upon arrival he was informed that the appointment had been cancelled because the prison did not provide the required work-up, including an MRI, ultrasound, and PSA test. (*Id.* at 32-33).

On November 11, 2025, Plaintiff saw Defendant Devenney for a yearly physical. He alleges he informed her of his prostate issues including the pain, swelling, and difficulty sleeping. (*Id.* at 33-34). Plaintiff also informed Devenney of the Flomax

reduction. He alleges that Devenney did not advise him that his PSA was elevated, and she merely told him he would have to wait to see a urologist. (*Id.* at 33-34). She offered no estimate as to when a visit might occur. (*Id.* at 34).

On November 15, 2025, Plaintiff filed an emergency grievance charging Defendants John Does 1-3, Devenney, Govro, Crain, Dolce, and the miscellaneous John Does with exhibiting deliberate indifference to his medical needs, and charging Defendants Plummer, Hughes, and Centurian for failing to correct the known medical deficiencies and/or failing to supervise and train subordinates. (*Id.* at 34-35). Plaintiff alleges the grievance went missing, and he tried to refile it on December 20, 2025, to no avail. (*Id.* at 35). Plaintiff alleges that his many attempts, written and verbal, that all went no where made him hopeless about his condition.

After requesting his medical records multiple times, Plaintiff finally received a copy on April 7, 2026. (*Id.* at 36-37). He alleges that he was alarmed to see his PSA had jumped from 1.5 to 5.4. (*Id.* at 37). He claims that Dr. Comparin had told him an increase in PSA with his other symptoms would necessitate a biopsy, but no one ever informed him about the increase nor scheduled any diagnostic care. (*Id.* at 38).

Plaintiff filed an emergency grievance about the denial of care and his increased PSA, charging John Does 1-5 with denying him access to a urologist, and charging Centurian, Hughes, and Plummer for failing to correct issues. (*Id.* at 38-39). Plaintiff alleges that Defendant Plummer expedited the grievance as an emergency, but Defendant Chadderton responded with misleading information indicating that Plaintiff was seen by a urologist on July 24, 2025, and by Dr. Devenney on November 11, 2025, concerning his

elevated PSA and enlarged prostate. (*Id.* at 39). Plaintiff alleges that Chadderton's representations were false because the July appointment was cancelled and Devenney refused to discuss his prostate issues. (*Id.* at 39). Plaintiff faults Plummer for signing off on Chadderton's misrepresentations. (*Id.*).

On April 18, 2026, Plaintiff alleges he wrote Hughes and Centurian about the denial of care by Devenney, Plummer, John Does 1-3, Crain, Dolce, and the miscellaneous John Does. He explained that he was not informed of his elevated PSA for two years, he was not seen by a urologist as needed to assess and treat his condition, and he could not even get responses to grievances, letters, or other correspondence. (*Id.* at 40). As with other letters, Plaintiff claims he got no response.

On May 26, 2026, Plaintiff saw Defendant Govro, a nurse practitioner, about his increased PSA and belief he needed a biopsy. He described his pain, sleeplessness, and frequent urination. Govro merely indicated there was nothing she could do and that he would have to wait to see a urologist. (*Id.* at 41). She had no estimate of when that would occur and did not perform any physical exam. On June 4, 2026, Plaintiff had another ultrasound, and on June 8, 2026, he had an MRI. Govro indicated on June 9, 2026, that the ultrasound "look[ed] good," but provided no other follow-up. (*Id.* at 42).

Plaintiff filed another grievance on June 10, 2026, including Devenney, Govro, Dolce, Crain, Chadderton, and all John Does. (*Id.* at 42). He got no response. (*Id.* at 43). On August 24, 2026, Plaintiff went to see a urologist concerning his MRI and an exam was performed. (*Id.* at 44). The urologist was concerned about Plaintiff's elevated PSA and indicated he would perform a hydrocele surgery and biopsy. (*Id.*). The doctor

indicated he was still awaiting the ultrasound results from Menard. He ordered another PSA check, and indicated as soon as he had results from the check and Menard he would schedule surgery. (*Id.* at 44). Plaintiff alleges that he also had his PSA drawn at the prison on August 27, 2026. (*Id.* at 45). On September 28, 2026, he learned from his medical records that his PSA had spiked to 20 without any medical follow-up. (*Id.*). As of October 5, 2026, Plaintiff reported that he had yet to receive any follow-up care. (*Id.* at 46).

Plaintiff alleges that he believes his grievances and letters should reach the intended destinations at the prison and that they warrant responses, but he does not get many responses at all. (*Id.* at 46-47). Plaintiff generally challenges the poor care he has received for over 36 months and alleges that the care has been objectively unreasonable. (*Id.* at 47-50).

Plaintiff goes on to fault individual defendants. He specifically faults Wexford and Centurion for having the responsibility to manage the healthcare system including, staffing, training, providing care, and paying for care. (*Id.* at 50). He faults John Doe 3, Devenney, Crain, Dolce, Govro, Chadderton, and miscellaneous John Does for providing medical care or referring inmates to specialized care. He also faults John Does 1 and 2 for being responsible for scheduling outside specialty care. (*Id.* at 51). He faults Hughes for overseeing the whole prison system. (*Id.* at 50-51). He faults Willis and Plummer for being responsible for operations at Menard. (*Id.* at 51).

Plaintiff has identified four enumerated claims, and sues all defendants in their individual and official capacity. (*Id.* at 52-67). Claim 1 alleges deliberate indifference by all defendants. (*Id.* at 52-62). Plaintiff faults Defendants Wexford, Centurian, Hughes,

Willis, and Plummer for implementing policies, practices, and customs that led to deliberately indifferent care. Plaintiff alleges these defendants had knowledge of a widespread practice of denying care and exhibiting deliberate indifference to him and many other similarly situated individuals. Plaintiff alleges the defendants failed to adequately train and supervise subordinates and failed to punish or discipline misconduct. He faults Centurian, Wexford, John Doe 3, Devenney, Crain, Dolce, Chadderton, and Govro for failing to send him out for treatment. Plaintiff faults Centurian, Wexford, Hughes, Willis, Plummer, John Does 1-3, Devenney, Crain, Dolce, Govro, and Chadderton for failing to properly obtain and maintain medical records. Plaintiff alleges the shortcomings in care have led to widely publicized lawsuits about inmates with many conditions, including those similar to him. Claims 2-4 rely on state law and name all defendants. (*Id.* at 62-68).

Plaintiff seeks a declaratory judgment and monetary compensation. He also seeks preliminary injunctive relief in the form of an order directing the defendants to perform a hydrocele surgery and biopsy. (Doc. 1 at 69).

The Court adopts Plaintiff's enumerated claims as follows:

**Claim 1:** **Eighth Amendment deliberate indifference/*Monell* claim against all Defendants;**

**Claim 2:** **Intentional infliction of emotional distress claim against all Defendants;**

**Claim 3:** ***Respondeat superior* state law claim against Defendants Wexford, Hughes, Centurian, Willis, and Plummer for the torts committed by their respective employees;**

**Claim 4:** **State law indemnification claim against Wexford, Centurian, Hughes, Willis, and Plummer for the judgments against their respective employees.**

The parties and the Court will use these designations in all future pleadings and orders unless otherwise directed by a judicial officer of this Court. Any claim that is mentioned in the Complaint but not addressed in this Order is considered dismissed without prejudice as inadequately pled under *Twombly*. *See* *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (an action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim that is plausible on its face").

**Preliminary Dismissals**

Plaintiff has named all defendants in their individual and official capacities, including the corporate medical providers Centurian and Wexford. The distinction is unnecessary for Centurian and Wexford as corporations, so the official capacity theory is dismissed as to these two defendants. As for the remaining Defendants, for those employed directly by IDOC, a suit against a state employee in official capacity is viewed as a suit against the state itself, and money damages cannot be secured from the state directly under § 1983. *See e.g.*, *Golbert v. Smith*, 190 F.4th 566, 572 (7th Cir. 2026) (explaining the distinction between personal and official capacity claims, and reiterating that a defendant sued in official capacity can assert Eleventh Amendment immunity, thus the relief available in an official capacity suit is generally prospective injunctive relief). As for the employees of the corporate medical providers, the corporation cannot be held liable purely for the misdeeds of an employee, so the official capacity claims against Wexford and Centurian's employees are not viable. *See, e.g.*, *Howell v. Wexford Health*

*Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021) ("In applying *Monell* and avoiding *respondeat superior* liability, one key is to distinguish between the isolated wrongdoing of one or a few rogue employees and other, more widespread practices."); *Monell v. Dept. of Social Serv. Of City of New York*, 436 U.S. 658, 690 (1978) (the wrongful acts of a single employee are not enough to impose liability on a municipality).

There is one narrow area where Plaintiff may be able to succeed against Defendants in their official capacity, and that is in association with his demand for preliminary/prospective injunctive relief. A demand against an official in official capacity for this sort of relief survives against any given official only as long as they hold their position, and as soon as their tenure ends, their successor is automatically substituted in their place. *Golbert*, 190 F.4th at 571-72 (explaining that if an official is sued in that capacity in federal court and the official dies or leaves office, then the official's successor automatically assumes that role in the litigation). Defendants Hughes and Plummer, the current heads of IDOC and Menard respectively, appear to be the appropriate defendants to implement any potential injunctive relief. Accordingly, the Court preliminarily dismisses all claims for relief in the Defendants' official capacities, other than those against Hughes and Plummer.

## Analysis

In order to prevail on a claim of deliberate indifference, a prisoner who brings an Eighth Amendment challenge of constitutionally deficient medical care must satisfy a two-part test. *See* Arnett v. Webster, 658 F.3d 742, 750 (7th Cir. 2011) (citation omitted). The first consideration is whether the prisoner has an "objectively serious medical condition."

*Id.* at 750; *accord*, *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). The second consideration is if the prisoner has demonstrated subjective indifference to his situation. The plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles v. Fahim*, 771 F.3d 402, 409 (7th Cir. 2014). Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). Furthermore, an inmate cannot demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

In addition to refusing treatment or providing treatment that is inadequate, a prison medical provider may also be liable for deliberate indifference based on allegations that they needlessly delayed treatment. To demonstrate that a delay caused a cognizable injury, an inmate must show that the delay either exacerbated his injury *or* that it unnecessarily prolonged the pain. *Thomas v. Martija*, 991 F.3d 763, 771 (7th Cir. 2021). In cases where prison officials delayed rather than denied treatment, the plaintiff must offer verifying medical evidence that the delay (rather than the underlying condition) caused some degree of harm. *Id.* at 749, *citing* *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013).

Beginning the analysis with the most obvious claims, Plaintiff faults Defendants Devenney and Govro for seeing him within the last year, listening to or being aware of his prostate issues, and refusing to alter or expedite the course of care in any fashion. Giving Plaintiff the inferences he is due on the allegations he has made, this has caused

him to languish in severe pain and it has also possibly allowed his condition to worsen as alleged via his elevated PSA. The assertion that Devenney and Govro did nothing in response to these circumstances is sufficient to proceed under the Eighth Amendment.

Additionally, Plaintiff faults Defendant Chadderton, whom he describes as a nursing supervisor, for misrepresenting his medical situation in response to a recent emergency grievance and thus causing further delays of his care. Taking Plaintiff's allegations about his chronology of care as true, and his assertions about what Chadderton wrote as true, he has adequately alleged that Chadderton exhibited deliberate indifference that caused a delay of care or allowed a worsening of his condition.

Next, the Court considers Defendants Crain, Dolce, John Does 1-3, and the miscellaneous John Does. Plaintiff alleges that he complained about these individuals in numerous grievances, and he gives at least eight dates that he attempted to file grievances. In the body of the grievances, he alleges he faulted these individuals for exhibiting deliberate indifference to his need for care, but he never once says in his summation of the grievances what these individuals personally did that caused him harm. The mere assertion that one or more defendants caused harm, without more specifics, is generally not enough to state a claim under § 1983. *See, e.g.*, *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (vague phrasing that does not adequately connect specific defendants to illegal acts is not sufficient to state a claim). Plaintiff generally described Crain, Dolce, and John Does 1-3 as officials responsible for supervising care at the prison or scheduling specialty visits, but he never describes what specifically they knew about

his situation or how they personally failed to carry out their duties. While it is reasonable to infer from Plaintiff's narrative that there were breakdowns in the medical system at Menard with respect to his prostate issues, he simply has not said enough about Crain, Dolce, or John Does 1-3 to plausibly attribute the problem to their individual actions. Thus, they are dismissed without prejudice. The same goes for the "miscellaneous" John Does for whom Plaintiff never even provided a job description, or a discrete number of individuals.

This leaves Defendants Hughes, Willis, and Plummer, as well as Wexford and Centurian. Plaintiff alleges wrote at least three letters to Hughes detailing his need for care; two letters to Wexford; and one letter to Centurian. Plummer learned of his situation via the emergency grievance process, and ultimately deferred to information from Chadderton that Plaintiff claims was inaccurate. The Court will first analyze Hughes, Willis, and Plummer in their individual capacity. The question is—did Plaintiff's 8+ grievances and his letters put these three defendants on sufficient notice that he had a serious medical condition, thus invoking a duty for them to investigate. And, if there was a duty to investigate, did they honor that duty?

Beginning with Hughes, the Court is always hesitant to hold those at the very top of the bureaucratic chain liable for the minutiae of daily prison operations for individual prisoners. The teachings of *Burks v. Raemisch* compel this sort of deference, advising that a letter writing campaign is not sufficient to hold individuals personally liable merely because they may have learned of an inmate's plight. 555 F.3d 592, 595 (7th Cir. 2009). But in contrast to *Burks*, the Seventh Circuit indicated in *Perez v. Fenoglio* that prison

officials who learn of a serious problem via multiple highly detailed pieces of correspondence and do not act may be held liable under § 1983. 792 F.3d 768, 781-82 (7th Cir. 2015). Plaintiff alleges he sent three highly detailed pleas for assistance to Hughes, with the most recent plea in April of 2026 explaining that his PSA had increased rapidly in the last two years without treatment or urology visits. This is enough to plausibly suggest that under *Perez*, Hughes may be liable for turning a blind eye to Plaintiff's plight.

Next, turning to Willis, though Plaintiff alleges that he complained about Willis in grievances and his letters to Hughes, he never gives clear information about an instance when Willis handled a grievance of his or when he otherwise communicated with Willis. Plaintiff also spends a lot of time in the complaint alleging that Willis had a duty to ensure adequate medical care at Menard and allowed systemic breakdowns that led to deliberate indifference. Merely being the supervisor of the prison is not enough. Plaintiff would need to allege instances when Willis became personally aware of his plight, and the similar plight of others, before he could make out a plausible individual capacity claim against Willis for deliberate indifference in his administration of medical services at the prison. Thus, Claim 1 against Willis is dismissed as inadequately pled.

As for Plummer, Plaintiff alleges that he deemed a grievance an emergency in the spring of 2026, but then wrongfully deferred to information Chadderton misrepresented. Plaintiff does not allege he ever followed-up with Plummer in any way about this discrepancy, though he does allege submitting once grievance in June of 2026. Prison administrators are allowed to defer to treating professionals for their expertise, so Plummer cannot be held liable for deliberate indifference unless Plaintiff has plausibly

alleged that he knowingly accepted and endorsed incorrect information. *See e.g.*, *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (nonmedical administrators can defer to health professionals so long as they do not ignore an inmate's plight). Plummer exercised the deference he is allowed to exercise under the law, so without more, the claim fails. Plaintiff has not said enough to substantiate such a claim, so the individual capacity element of Claim 1 against Plummer is dismissed with prejudice.

As to Wexford and Centurian, Plaintiff's complaint is not the picture of clarity, but it is obvious that he believes these medical contractors are central to the delays and lack of treatment he has experienced, and he gives a few theories for this belief. First and foremost, he alleges that two surgeons told him they would operate as soon as Wexford issued authorizations, but the first surgery did not occur for approximately 4 months after the urologist made the recommendation and the second surgery recommended in April of 2024 was never approved and did not occur. A third surgery was recommended in August of 2026, but the surgeon indicated it could not occur until he received additional records from the prison and the surgery has not occurred as of October 2026. This plausibly suggests that delays in referrals might be attributable to some machination of Wexford or Centurian. Second, he alleges that Wexford and Centurian do not provide adequate staffing, training, general management of the healthcare system, or financing to provide reasonable medical care for inmates' needs. Third, he alleges that they failed to keep adequate medical records, and they knew that there were systemic problems with inmates (including those with conditions similar to his) receiving needed medical care.

Fourth, he alleges that they did not provide pain medication for years and allowed his Flomax prescription to be reduced without reason.

These theories are not artfully pled, but the Court accepts them as a pro se litigant's best effort to describe problems with the corporate medical providers that he believes may have caused the allegedly deficient care he has received. Plaintiff asserts that the problems are not limited only to his care, and that these entities are aware of problems with other inmates, including inmates similar to him. The Court is independently aware of several cases in this District involving alleged delays in the diagnosis and treatment of potential cancer, so the Court accepts for now Plaintiff's assertion that the problem is not unique to him and may be widespread. Plaintiff likely would benefit from discovery to further develop these theories and to refine them into narrower claims. For now, the Court is satisfied that Plaintiff has adequately suggested Wexford and/or Centurian had an instrumental role in the system that has not provided him care for a deteriorating condition.

Finally, the Court must discuss the official capacity assertions against Defendants Hughes and Plummer. As with Wexford and Centurian, the allegations against Hughes and Plummer in this respect are far from artful. In essence, Plaintiff faults these two for presiding over a healthcare system that they know is failing. Defendants Hughes and Plummer are state employees named in their official capacity so the Court must consider if they are even subject to this claim because the IDOC is protected from suit by sovereign immunity under the Eleventh Amendment. *See* *Norfleet v. Walker*, 684 F.3d 688, 690 (7th Cir. 2012) ("plaintiff sued the defendants in their official capacity, and so the lawsuit is

against a state agency"). The Eleventh Amendment generally bars private suits in federal court against a state for monetary damages. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989); *MCI Telecomm. Corp. v. Ill. Bell Tel. Co.*, 222 F.3d 323, 336 (7th Cir. 2000). That immunity extends to state agencies as well and, subject to the *Ex Parte Young* doctrine, to state employees acting in their official capacities. *MCI Telecomm.*, 222 F.3d at 336–37 (discussing *Ex Parte Young*, 209 U.S. 123 (1908)). Under the exception outlined in *Ex Parte Young*, the Eleventh Amendment does not bar a lawsuit against an individual state official in their official capacity for an ongoing violation of federal law if the remedy sought is prospective injunctive or declaratory relief. *MCI Telecomm.*, 222 F.3d at 345 ("[A] private party may sue individual state officials in federal court to obtain prospective relief for an ongoing violation of federal law."). The *Ex Parte Young* doctrine applies in this case, because Plaintiff seeks follow-up diagnostic and medical care for his enlarged prostate, hydrocele, and elevated PSA, problems for which he has been seeking treatment for four years at this point. As with Wexford and Centurian, the Court accepts at this preliminary juncture that Plaintiff has adduced sufficient information to plausibly allege that his medical situation may be due in part to failures of the IDOC medical system that were known to Hughes and Plummer, but that have not yet been remediated. Accordingly, Plaintiff may proceed against Hughes and Plummer in their official capacity to the extent that he seeks their assistance securing timely care for his enlarged prostate, hydrocele, and elevated PSA.

**Claim 2**

In Claim 2, Plaintiff faults all defendants for the intentional infliction of emotional distress. Under Illinois law, to state a claim for intentional infliction of emotional distress, a plaintiff must allege (1) the defendants engaged in extreme and outrageous conduct; (2) the defendants either intended to inflict severe emotional distress or knew there was a high probability that their conduct would cause severe emotional distress; and (3) the defendants' conduct in fact caused severe emotional distress. *McGreal v. Vill. Orland Park,* 850 F.3d 308, 314 (7th Cir. 2017). *See also* *Bailey v. City of Chic.*, 779 F.3d 689, 696–97 (7th Cir. 2015); *Schiller v. Mitchell*, 828 N.E.2d 323, 333 (Ill. App. Ct. 2005) (citing *Pavlik v. Kornhaber*, 761 N.E.2d 175 (Ill. 2001)). Though Plaintiff describes distress over his condition at several points in his complaint, he does not clearly associate these narrative sections with the actions of individual defendants. The conclusory assertion that all defendants' actions were extreme and outrageous is not sufficient to make out a plausible claim. Thus, Claim 2 is dismissed as insufficiently pled.

**Claims 3-4**

In Claims 3 and 4, Plaintiff alleges that he is seeking to recover via *respondeat superior* liability under state law and that he seeks to invoke an "indemnification state law claim." The problem with these two theories is that neither provides an independent basis for relief. The Illinois Supreme Court has indicated that *respondeat superior* liability is a theory of recovery rather than a freestanding claim, explaining that a negligence claim could stand against a hospital for a doctor's actions, and that *respondeat superior* would merely be a theory within the negligence claim. *See e.g.*, *Wilson v. Edward Hosp.*, 981

N.E.2d 971, 979-81 (Ill. S. Ct. 2012); *see also Armbruster v. Wexford Health Sources, Inc.*, 2017 WL 2619032 at * 3 (S.D. Ill. June 16, 2017) (explaining that *respondeat superior* liability under state law is not a freestanding claim). In the instant case, Plaintiff does not have a freestanding negligence or medical malpractice claim within which to litigate the sub-theory of *respondeat superior* liability. *Respondeat superior* liability is not recognized in association with § 1983 claims, and he cannot use state law to make this theory viable without having a freestanding state law claim such as negligence or malpractice. Accordingly, Claim 3 will be dismissed.

As for Claim 4, courts have indicated that there is no private cause of action for state law indemnification. Under the State Employee Indemnification Act, 5 ILCS 350/1, *et seq*., the State is obligated to indemnify "any State employee" in civil actions against the employee for "act[s] or omission[s] occurring within the scope of the employee's State employment" and the Attorney General is to appear on that employee's behalf. 5 ILCS 350/2(a) and (e)(ii). The Act does not, however, expressly create a private cause of action and Plaintiff has not alleged that there is an implied cause of action. *Emerald Pork, II, Ltd. v. Purina Mills, Inc.*, 17 F. Supp. 2d 816, 817 (C.D. Ill. 1998) (a private cause of action is implied when: "(1) plaintiff is a member of the class for whose benefit the Act was enacted; (2) it is consistent with the underlying purpose of the Act; (3) plaintiff's injury is one the Act was designed to prevent; and (4) it is necessary to provide an adequate remedy for violations of the Act."). Thus, Plaintiff's state law claim for indemnification is dismissed.

## Disposition

**IT IS HEREBY ORDERED THAT Claim 1** of the Complaint (Doc. 1) survives against Defendants Wexford, Centurian, Hughes (individual and official capacity), Plummer (official capacity only), Devenney, Chadderton, and Govro, and by contrast Claim 1 is insufficiently pled as to Defendants Willis, Crain, Dolce, John Does 1-3, and miscellaneous John Does. **Claims 2-4** are dismissed as insufficiently pled or for lacking a valid legal basis. The Clerk of Court shall **TERMINATE** Defendants Willis, Crain, Dolce, John Does 1-3, and miscellaneous John Does.

**Defendants Hughes, Plummer, and Centurian are DIRECTED to respond to Plaintiff's demand for preliminary injunctive relief within 14 days of returning executed waivers of service. Their response should specifically address Plaintiff's assertion that his PSA has reportedly increased drastically as he alleges he learned on September 28, 2026, and they should address Plaintiff's assertion that in late August of 2026 a urologist recommended a hydrocele surgery and biopsy (Doc. 1 at 44-45).**

The Clerk of Court is **DIRECTED** to prepare for Defendants Wexford, Centurian, Hughes (individual and official capacity), Plummer (official capacity), Devenney, Chadderton, and Govro: (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the Complaint (Doc. 1), and this Memorandum and Order to Defendants' place of employment as identified by Plaintiff. If a Defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service

on Defendant, and the Court will require Defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

If a Defendant cannot be found at the work address provided by Plaintiff, the employer shall furnish the Clerk with the Defendant's current work address, or, if not known, the Defendant's last-known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk. Address information shall not be maintained in the court file or disclosed by the Clerk.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the Complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g). Pursuant to Local Rule 8.2, Defendants need only respond to the issues stated in this Merits Review Order.

If judgment is rendered against Plaintiff, and the judgment includes the payment of costs under Section 1915, Plaintiff will be required to pay the full amount of the costs, regardless of whether his application to proceed in forma pauperis was granted. See 28 U.S.C. § 1915(f)(2)(A).

Plaintiff is **ADVISED** that he is under a continuing obligation to inform the Clerk of Court and each opposing party of any address changes; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than 14 days after a change of address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for failure to prosecute. FED. R. CIV. P. 41(b).

The Clerk of Court is **DIRECTED** to enter the standard HIPAA Order in this case because it will involve the exchange of medical records.

**IT IS SO ORDERED.**

Dated: November 3, 2026

DAVID W. DUGAN
United States District Judge

## NOTICE TO PLAINTIFF

The Court will take the necessary steps to notify the appropriate defendants of your lawsuit and serve them with a copy of your complaint. After service has been achieved, the defendants will enter their appearance and file an Answer to the complaint. It will likely take at least 60 days from the date of this Order to receive the defendants' Answers, but it is entirely possible that it will take 90 days or more. When all of the defendants have filed Answers, the Court will enter a Scheduling Order containing important information on deadlines, discovery, and procedures. Plaintiff is advised to wait until counsel has appeared for the defendants before filing any motions, to give the defendants notice and an opportunity to respond to those motions. Motions filed before defendants' counsel has filed an appearance will generally be denied as premature. Plaintiff need not submit any evidence to the Court at his time, unless otherwise directed by the Court.

The Court wishes to remind the Plaintiff that litigation is often viewed a series of hurdles that the Plaintiff must clear to get to another hurdle. Initial screening is such a hurdle, but it is a very low one for the Plaintiff to clear. As noted above, surviving initial screening only requires the bare statement of a claim that, if proven, could entitle Plaintiff to some relief. At trial, he will need to prove by a preponderance of evidence that the facts alleged actually occurred and that those facts satisfy the legal requirements for recovery. Trial is the highest and most difficult of hurdles for any Plaintiff to clear.